**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE, AND
AGRICULTURAL IMPLEMENT WORKERS OF
AMERICA; and WILLIAM ENGLISH; GERALD
M. SYKES; LARRY J. SCOTT; and BEVERLY
JENNINGS, on behalf of themselves and all
other persons similarly situated,

      Plaintiffs,

v.                                                                    Case No. 07-CV-14310

CHRYSLER LLC,

      Defendant.

_____/

**FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF FINAL**
**APPROVAL OF CLASS ACTION SETTLEMENT AGREEMENT**

Before the court is this health care benefits class action in which the contesting

parties have presented to the court a proposed global settlement agreement.  The court

received written objections from members of the class, who were also permitted to

orally object during a June 30, 2008 fairness hearing.  After the hearing, the parties

submitted joint proposed findings of fact and conclusions of law in support of final

approval of the class action settlement, which the court has thoroughly examined.  A

majority of the proposed findings and conclusions are uncontested and the court has

adopted them in large measure and rejects all objections inconsistent with these

findings of fact and conclusions of law.

## I. FINDINGS OF FACT

### A. The Lawsuit

1. On October 11, 2007, Plaintiffs William English, Gerald M. Sykes, Larry J. Scott, and Beverly Jennings (the "Class Representatives") filed suit on behalf of a class of retired Chrysler LLC ("Chrysler") employees and their spouses, surviving spouses, and dependents, along with the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW"), challenging Chrysler's position that retiree health care benefits are not vested and can be unilaterally terminated or changed by Chrysler at any time. (Dkt. #1, Compl.) The Class Representatives and the UAW filed a First Amended Complaint on April 10, 2008. (Dkt. #33, First Amended Compl.)

2. As alleged in Plaintiffs' First Amended Complaint, over the years the UAW negotiated a series of collective bargaining agreements ("CBAs") with Chrysler, which set forth terms governing retiree health care benefits. (Dkt. #33, First Amended Compl. ¶¶ 10-11; Dkt. #34, Answer to First Amended Compl. ¶¶ 10-11.) In this action, the Class Representatives and the UAW generally seek a declaration that, under the controlling CBAs, Chrysler cannot unilaterally modify or terminate retiree medical benefits. (Dkt. #33, First Amended Compl., ¶¶ 3-4, 25-30.) These benefits are essentially identical for all class members. (*Id.* ¶ 14.)

3. Plaintiffs' complaint sought certification of a plaintiff class of Chrysler retirees pursuant to Fed. R. Civ. P. 23(b)(2), which provides for certification where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory

relief with respect to the class as a whole." (Dkt. #1, Complaint, ¶ 1; Dkt. #22 First Amended Compl. ¶ 1.)  Plaintiffs moved for class certification on March 30, 2008.  (Dkt. #25.) The court certified the class on April 9, 2008.  (Dkt. #31.)

### B.  The Parties

4.      Defendant Chrysler and Plaintiff UAW have historically been parties to CBAs under which Chrysler provides health care benefits to qualifying retirees and their spouses, surviving spouses, and dependents.  (Dkt. #33, First Amended Compl. ¶¶ 10-11; Dkt. #34, Answer to First Amended Compl. ¶¶ 10-11.)  In September 2007, Chrysler and the UAW entered into negotiations for a new CBA.  In connection with those negotiations Chrysler and the UAW entered into discussions on the question whether Chrysler would continue to provide retiree health care benefits to current and future UAW retirees.

5.      Other than Plaintiff Jennings, the individuals named as Class Representatives are all Chrysler retirees.  (Dkt. #33, First Amended Compl., ¶¶ 6-8.) Mrs. Jennings is the surviving spouse of a Chrysler retiree.  (*Id.* ¶ 9.)  The three retiree Class Representatives were elected by fellow retirees to serve on various retired worker councils.  (*Id.* ¶¶ 6-8.)  The Class Representatives all currently receive retiree health care benefits from Chrysler.  (*Id.* ¶¶ 6-9.)

6.      More particularly, Plaintiff English was until his retirement in December 1975 employed by Chrysler in Detroit, where he was a member of a bargaining unit represented by the UAW.  After his retirement from Chrysler, Plaintiff English was elected by his fellow retirees to serve as chairman of a retiree chapter covering retirees from his local union.  (*Id.* ¶ 6.)

7. Plaintiff Sykes was employed by Chrysler until his retirement in 1994, first at its Warren, Michigan location and then at its Centerline, Michigan, location, where he was a member of bargaining units represented by the UAW. After his retirement from Chrysler, Plaintiff Sykes was elected by his fellow retirees as chairman of the Western Kentucky Retired Workers Council covering retirees from his region. (*Id.* ¶ 7.)

8. Plaintiff Scott was employed by Chrysler until his retirement in 1996 in Kokomo, Indiana, where he was a member of a bargaining unit represented by the UAW. After his retirement from Chrysler, Plaintiff Scott was elected by his fellow retirees as chairman of a retiree chapter covering retirees from his local union. (*Id.* ¶ 8.)

9. Plaintiff Jennings is the surviving spouse of Lewis Jennings, now deceased. Until his retirement in 1991, Lewis Jennings was employed by Chrysler in Fenton, Missouri, where he was a member of a bargaining unit represented by the UAW. (*Id.* ¶ 9.)

## C. The Class

10. On April 9, 2008, the court certified a Class consisting of[1]:

(i) Chrysler-UAW Represented Employees who, as of October 29, 2007, were retired from Chrysler with eligibility for Retiree Medical Benefits under the Chrysler Plan, and their eligible spouses, surviving spouses and dependents;

---

[1] The capitalized terms in this definition have the same meaning as in the parties' March 30, 2008 Settlement Agreement, Dkt. #26-3.

(ii)  surviving spouses and dependents of any Chrysler-UAW Represented Employees who attained seniority and died on or prior to October 29, 2007 under circumstances where such employee's surviving spouse and/or dependents are eligible to receive Retiree Medical Benefits from Chrysler and/or the Chrysler Plan;

(iii)  former Chrysler-UAW Represented Employees or UAW-represented employees who, as of October 29, 2007, were retired from any previously sold, closed, divested or spun-off Chrysler business unit with eligibility to receive Retiree Medical Benefits from Chrysler and/or the Chrysler Plan by virtue of any agreement(s) between Chrysler and the UAW, and their eligible spouses, surviving spouses, and dependents; and

(iv)  surviving spouses and dependents of any former Chrysler-UAW Represented Employee or UAW-represented employee of a previously sold, closed, divested or spun-off Chrysler business unit, who attained seniority and died on or prior to October 29, 2007 under circumstances where such employee's surviving spouse and/or dependents are eligible to receive Retiree Medical Benefits from Chrysler and/or the Chrysler Plan.

(Dkt. #31, Order, ¶ 8; *see also* April 9, 2008 minute entry)

11.    In its April ruling certifying the Class, the court found as follows:

(i)        Numerosity was satisfied by the fact that there are approximately 125,000 retirees in the Plaintiff class.  (Dkt. #31, ¶ 2.)

(ii)     Commonality was satisfied "because members of the proposed class are covered by labor agreements and plan documents containing virtually identical provisions concerning the obligations of [Chrysler] to provide retiree health care benefits.  Common questions include: (1) whether Section 301 of the LMRA . . . prohibits Chrysler from unilaterally reducing class members' health-care benefits; and (2) whether ERISA . . . also prohibits Chrysler from doing so."  (*Id.*  ¶ 3.)

(iii)    Typicality was "satisfied because . . . Chrysler has announced its intention to unilaterally modify hourly retiree health care benefits, which, if implemented, will affect Class Representatives and the proposed class in the same way."  (*Id.* ¶ 4.)

(iv)    The adequacy requirement was satisfied because "Class Representatives have common interests with the unnamed class members, as established by the fact that Rule 23(a)(2) commonality and Rule 23(a)(3) typicality are satisfied; further, nothing suggests that Class Representatives have interests conflicting or antagonistic to the interests of the proposed class.  Second, Class Representatives will vigorously represent the interests of the proposed class through qualified class counsel."  (*Id.* ¶ 5)

12.     In its April 10, 2008 order, the court also affirmed and finalized its October 27, 2007 appointment of Stember Feinstein Doyle & Payne LLC as Class Counsel. (Dkt. #31, pp. 4-5, ¶ 3.)  The court concluded that "the attorneys in this firm will fairly and adequately represent the interests of the class, in consideration of the work counsel

has done in identifying or investigating potential claims in this action, counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in this action, counsel's knowledge of the applicable law, and the resources counsel will commit to representing the class."  (*Id.*)

### D.  Plaintiffs' Claims and Chrysler's Defenses

13.     Plaintiffs allege that under the terms of the CBAs, Chrysler "is obligated . . . to provide" to the Class "vested retiree health care benefits" and that "Chrysler cannot unilaterally terminate or modify those benefits."  (Dkt. #33, First Amended Compl. ¶ 17.) Plaintiffs further allege that Chrysler's announcement in connection with the 2007 negotiations that it would make unilateral reductions in retiree health care benefits provided to qualifying retirees and their spouses, surviving spouses, and dependents is "an anticipatory repudiation of that contractual obligation."  (*Id.* ¶¶ 23, 26.)

14.     In Count I, brought under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, Plaintiffs seek "a declaration that the rights to retiree health care benefits provided for under collective bargaining agreements between Chrysler and the UAW cannot be unilaterally terminated or modified by Chrysler, and a permanent injunction prohibiting such termination or modification."  (*Id.* ¶¶ 3, 25-27.)

15.     In Count II, brought under § 502(a)(1)(B) and (a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B) and (a)(3), Plaintiffs seek "a declaration that rights to retiree health care benefits provided for under Chrysler's employee welfare benefit plan cannot be unilaterally terminated or modified by Chrysler, and a permanent injunction prohibiting such termination or modification."  (*Id.* ¶¶ 4, 28-30.)

16.     Chrysler filed its Answer and Affirmative Defenses to the First Amended

Complaint on April 18, 2008.  (Dkt. #34)  Chrysler asserts that "retiree health care

benefits are not vested and can be unilaterally terminated or changed by the Company

at any time."  (*Id.*, Preliminary Statement, p. 1.)  Chrysler also asserts affirmative

defenses, including that the First Amended Complaint fails to state a claim upon which

relief can be granted; that Plaintiffs' claims are barred by the terms of the collective

bargaining agreements and the governing plan documents, and are barred by waiver,

ratification, estoppel, laches, and/or lack of standing; that to the extent class

representatives or members of the putative class have agreed to release their claims

against Chrysler, such claims are barred; that to the extent Plaintiffs' claims are

untimely, they are barred by the applicable statutes of limitation; and that Plaintiffs'

claims are barred to the extent predicated upon alleged representations that are not

embodied in the retiree health care plan documents.  (*Id.*, Affirmative Defenses, p. 12.)

### E.  Chrysler's Financial Struggle

17.     Over the past several years, Chrysler has faced a severe and ongoing

financial crisis, and Chrysler's value as an ongoing business has declined precipitously.

When it merged with Daimler AG in 1998, Chrysler was valued at $36 billion.  Nine

years later, Daimler "essentially pa[id] a private investment company," Cerberus, "to

take money-losing Chrysler off its hands."  (Dkt. #42-19, Declaration of John A. Litwinski

("Litwinski Decl."), Exh. A.)  Showing the magnitude of the decline in Chrysler's fortunes,

most of the $7.4 billion paid by Cerberus to acquire control of Chrysler in 2007 went

"into Chrysler and Chrysler Financial," and Daimler received only $1.35 billion for the

company that it had paid $36 billion to acquire nine years earlier.  (*Id.*; *see also* Dkt. #42-3, Kolka Decl., ¶ 6.)

18.     Chrysler's current financial troubles reflect a longer business trend.  In 2000, Chrysler controlled approximately 15% of the U.S. light-vehicle market.  (Dkt. #42-20)  In May of 2008, Chrysler's U.S. sales fell 25% compared with the prior period. Since last year alone, Chrysler's U.S. market share has "declined more than two full percentage points to 10.6% — a huge drop in an industry that frets over the loss of tenths of a point."  (Dkt. #42-24, Litwinski Decl., Exh. C.)  Industry-wide, automobile sales this year have been at their lowest level in 16 years.  (Dkt. #42-24, Litwinski Decl., Exh. F.)

19.     Chrysler's credit rating was recently downgraded to "B" by Fitch Ratings, with a negative outlook.  (Dkt. #42-22, Litwinski Decl, Exh. D.)  Chrysler's B rating signals to investors that its debt is in the category of speculative or non-investment grade, which indicates a higher level of credit risk than higher-grade investments.  (Dkt. #42-23, Litwinski Decl., Exh. E.)  Standard & Poor's has also assigned a negative outlook to Chrysler and recently noted the negative implications to Chrysler's credit rating of deteriorating U.S. auto industry conditions.  (Dkt. #42-28, Litwinski Decl., Exh. J.)  The deterioration of Chrysler's credit ratings inhibits the company's access to the capital required to fund its businesses and increases the cost of borrowing.  This in turn limits Chrysler's ability to generate revenue and invest in its businesses and products. (Dkt. #42-3, Kolka Decl., ¶ 7; *see also* Dkt. #42-7, Hadrych Decl., ¶ 6.)

### F.  The Role Health Care and Retiree Health Care Costs in Chrysler's Financial Struggle

20.     As one of the largest private purchasers of health care in the U.S.,

providing health care benefits to approximately 315,000 people, over 52% of whom are

retirees and their dependents, Chrysler's health care costs have a significant impact on

its business and financial condition.  (Dkt. #42-7, Hadrych Decl., ¶¶ 2-3.)  In general,

Chrysler provides retiree health care benefits on a "defined benefit plan" basis, meaning

that benefits are provided according to the described coverage, not according to a

specific dollar amount.  (*Id.* ¶ 3.)  Chrysler's future financial responsibility for coverage

under a defined benefit plan is reflected on the company's balance sheet in the form of

Other Post Employment Benefit or "OPEB" obligation.  The largest portion of Chrysler's

OPEB liability is attributable to UAW employee and retiree health care.  (*Id.*)

21.     Because the OPEB obligation extends far into the future and there are so

many variables that influence its calculation, including mortality rates, health care

inflation rates, asset return rates, etc., there is substantial uncertainty surrounding an

assessment of the obligation.  (*Id.* ¶ 4.)  Given this uncertainty, lending institutions tend

to treat the OPEB obligation as even greater than it may prove to be, which adversely

affects assessments of Chrysler's creditworthiness.  (*Id.*)

22.     Chrysler's OPEB obligation and health care costs continue to have an

adverse impact on its financial health and ability to compete.  Lenders generally are

unwilling to accept the risk associated with such an uncertain but substantial liability,

which is one of the principal reasons that Chrysler's credit rating presently is classified

as well below investment grade.  (*Id.* ¶ 6.)

23.     In addition, because many foreign competitors lack the legacy

expenses—particularly retiree health care expenses—of long-established companies

such as Chrysler, these foreign companies continue to have a significant pricing and competitive advantage. (Dkt. #42-3, Kolka Decl., ¶ 5.) In 2007, for example, Chrysler's total labor cost per hour was approximately $25 to $30 greater than the estimated total labor cost per hour for Japanese auto manufacturers (e.g., Toyota, Honda, and Nissan). (*Id.*) Chrysler's health care cost, especially as compared to those of its closest competitors, has been a significant factor in weakening its financial condition. (*Id.* ¶ 8)

24. The overall impact of Chrysler's OPEB obligation for health care is expected to continue to severely limit the company's access to unsecured capital resources, substantially contributing to Chrysler's precarious financial condition. Without access to unsecured debt markets, Chrysler must resort to asset sales or secured debt funding, which greatly diminishes Chrysler's flexibility, increases its costs, and diminishes its ability to withstand weaker periods of the business cycle. (Dkt. #42-7, Hadrych Decl., ¶ 6.)

25. Presently, there are approximately two hourly retirees for every active hourly employee. This ratio has been increasing and is expected to continue to increase as Chrysler further restructures its workforce. As a result, an ever greater percentage of Chrysler's resources are devoted to health care management and administration, and away from its principal business of making cars and trucks. This diversion from its core business priorities serves only to jeopardize Chrysler's ability to succeed and, ultimately, to fund such benefits. (*Id.* ¶ 7.)

### G. Chrysler's Business And Its Impact On Michigan And Other U.S. Communities

26. Despite its struggles, Chrysler remains one of America's largest

manufacturers.  Either directly or indirectly, more than 500,000 Americans earn their

living building, marketing and selling Chrysler cars and trucks.  (Dkt. #42-3, Kolka Decl.,

¶ 12.)  Chrysler is also one of the largest private purchasers of health care in the United

States, spending over $2.3 billion a year for health care benefits for its employees and

retirees.  (Dkt. #42-27, Litwinski Decl., Exh. I.)  The majority of this $2.3 billion a year is

spent on retiree health care benefits.  (Dkt. #42-3, Kolka Decl., ¶ 5; Dkt. #42-7, Hadrych

Decl., ¶ 3.)

27.     Chrysler is vital to the economies of the state of Michigan and other

communities throughout the United States, with manufacturing assembly plants in five

states and other operations, such as service parts warehousing facilities, engine

manufacturing plants and stamping operations located throughout the country.  In

southeast Michigan alone, Chrysler has numerous operations, including factories,

technical and research facilities, and its Auburn Hills headquarters in suburban Detroit.

Tens of thousands of Chrysler employees work at those facilities, and Chrysler buys

goods and services from scores of independent contractors, consultants, craft persons,

truck drivers and all manner of businesses.  Chrysler also spends billions of dollars on

automotive parts it purchases from several southeastern Michigan businesses,

supporting thousands of jobs.  In the past five years, Chrysler has made capital

investments of more than $15 billion in the U.S., and purchased hundreds of billions of

dollars in parts and supplies.  (Dkt. #42-3, Kolka Decl., ¶ 12.)

### H.  Chrysler's Turnaround Plan

28.     As part of its turnaround plan announced in February 2007, Chrysler has

undertaken multiple initiatives to reduce costs and the risks to its business.  (*Id.* ¶ 10.)

These reductions are in addition to the deep cuts the company has had to make in the past, including in 2001 and 2002, when the company laid off 26,000 workers and closed six plants.  (Dkt. #42-25, Litwinski Decl., Exh. G.)  In February 2007, Chrysler announced the layoffs of 13,000 workers.  In November 2007, the company announced the layoffs of a further 12,000 workers—a full 15% of its workforce.  (Dkt. #42-26, Litwinski Decl., Exh. H.)  These deep cuts have affected both salaried and hourly employees.

29.     Chrysler continues to address its financial condition through significant operational changes, intended to both reduce costs and improve its profitability.  In this regard, Chrysler has reduced fixed costs by over $3 billion since 2004.  At the same time, Chrysler has introduced several new vehicle models in the past two years that have been well received by commentators and consumers alike.  In addition, Chrysler is aggressively pursuing the next generation of alternative fuel technology, such as fuel cells and bio-fuels.  This progress, however, may be jeopardized by an unpredictable short-term escalation in health care costs that would consume needed resources and result in the postponement or even cancellation of programs essential to Chrysler's business and its long-term success.  (Dkt. #42-7, Hadrych Decl., ¶ 9.)

### I. The Parties' Negotiations

30.     In connection with the 2007 negotiations, Chrysler provided the UAW with extensive information about its financial condition and health care expenditures.  (Dkt. #19, Exh. 1, p. 1; *see also* Dkt. #26, Exh. 1, § 3.)  This information was reviewed by the UAW and by its advisors, including investment bankers, actuaries and legal experts, who assessed Chrysler's financial condition and analyzed the benefits of the proposed

13

arrangement and the funds necessary to provide ongoing retiree health care benefits. (*Id.*)  Representatives of the UAW and its team of advisors also met with Chrysler officials, who answered questions and provided further detail, as requested.  (Dkt. #26, Exh. 1, § 3.)

31.     Both the UAW and Class Counsel have recognized that Chrysler's health care costs threaten "Chrysler's financial condition and its ability to compete in the North American marketplace," as well as Chrysler's ability to continue to provide retiree health care benefits to class members.  (Dkt. #26, Exh. 1, Settlement Agmt., § 3; *see also* Dkt. #25, Exh. 1, Declaration of William T. Payne ("Payne Decl."), ¶ 33 ("Based on our investigation, Class Counsel concluded that Chrysler faced ongoing and very serious financial difficulties, and this conclusion was a major factor in our decision to enter into the settlement.").)

32.     These negotiations in 2007 culminated in the UAW and Chrysler entering into a memorandum of understanding ("MOU") last fall provisionally resolving their dispute over whether Chrysler had an obligation to continue providing retiree health care benefits to past and certain present UAW employees.  (Dkt. #19, Exh. 1.)  The MOU outlined the parties' initial agreement to permanently shift responsibility for providing post-retirement medical benefits from Chrysler to the new plan and new voluntary employees beneficiary association ("VEBA").  (*Id.*)  The MOU provisions applicable to active employees were ratified by UAW-represented Chrysler employees as part of their ratification of a new National Agreement on October 29, 2007.  (Dkt. #26 at Exh. 2, Ross Decl., sub-Exh. C.)  Under the terms of the MOU, active Chrysler hourly employees would give up certain previously-negotiated wage increases, cost-of-living

14

allowance adjustments, and profit sharing plan offsets in order to partially fund retiree health care benefits. (Dkt. #19, Exh. 1, MOU, Appx. C1.)

33. The proposed framework for settlement, embodied in the MOU, was contingent on approval by Class Counsel following Class Counsel's independent investigation.

34. Even after Class Counsel completed their investigation and approved the framework, many details remained to be negotiated among the parties. (Payne Decl. ¶28.)

35. Class Counsel, the UAW and Chrysler did in fact negotiate a detailed, comprehensive agreement, the March 30, 2008 Settlement Agreement presented to this court with the Joint Motion for Preliminary Approval of Class Action Settlement Agreement and Proposed Class Notice. (Dkt.#26-03.)

36. Class Counsel was an active participant and negotiated matters in addition to or different from what was in the MOU, including standards for investment management once the VEBA is established. (Payne Decl. ¶28.)

## J. Investigation by the UAW and Class Counsel of the Likelihood of a Chrysler Default in the Future and the Adequacy of the Proposed Funding of the New VEBA

37. As noted above, before entering into the MOU, the UAW retained experts to advise the union about the risk of a future Chrysler default and the impact of a default on retiree health obligations.

38. The UAW retained Lazard Frères & Co., LLC ("Lazard") to perform the financial analysis, and Milliman to perform the actuarial analysis. Each company is among the leaders in its respective field.

39.     The evidence showed that Chrysler gave the Class, the UAW, and their advisors access to a large quantity of confidential and actuarial information.  For example, Chrysler gave Lazard access to relevant financial information, including confidential projections and business plans.  (Dkt. #43, Declaration of Jim Millstein ("Millstein Decl.") ¶¶ 8-10.)

40.     Chrysler's actuarial firm, Watson Wyatt Worldwide, provided Milliman with its own model for projecting health care benefit costs in the future, along with historical plan costs and demographic information about the individuals who would be entitled to benefits under the proposed settlement.  Lazard and Milliman developed independent cash flow and financial models to analyze the funding requirements and adequacy of the proposed VEBA.  (Dkt. #44, Declaration of Suzanne Taranto ("Taranto Decl.") ¶ 5; Millstein Decl. ¶¶ 15-16.)

41.     Lazard concluded that Chrysler's financial position was and remains precarious, notwithstanding its recent operating and cost savings initiatives.  Lazard's concerns regarding the achievability of Chrysler's Plan have been exacerbated, as the North American automotive market has continued to deteriorate in 2008 and the Company now faces increasing macroeconomic headwinds.  (Millstein Decl. ¶ 13.) Chrysler's highly-leveraged balance sheet, small scale, geographical and product concentration and low credit ratings leave it highly vulnerable and at risk of financial distress.   (*Id.*)

42.     Lazard recommended to the UAW that it explore the establishment of a VEBA trust to take over Chrysler's health care obligations to UAW retirees so as to mitigate the adverse impact that further deterioration in Chrysler's financial position and

credit quality could have on its ability to meet its obligations with respect to post-retirement health care to its UAW retirees. (Millstein Decl. ¶ 14.)

43. In designing a VEBA trust, UAW's objective was that the trust be funded sufficiently to provide existing health care benefits over the lifetime of all current and future eligible retirees without any material reductions in existing coverage and without requiring any material increase in the retirees' share of the cost of providing such coverage. (Millstein Decl. ¶ 15.)

44. Numerous discussions with Chrysler and their actuaries took place during the summer of 2007, as Milliman validated the long term postretirement health care plan cash flows. (Taranto Decl. ¶ 8.) As part of that validation, Milliman reviewed the assumptions chosen by the actuaries and Chrysler for reasonableness, and discussed with the UAW the potential ranges within which certain economic and demographic assumptions could fall. (*Id.*) With the exception of the long term investment rate, which was established through bargaining and is discussed below, in Milliman's opinion the assumptions used to project the expected future benefit cash flows and the adequacy of expected VEBA funding fell within a range that reasonably anticipates experience under the plan. (*Id.*)

45. With respect to the assumption that the VEBA assets would earn 9 percent annually on investments, Milliman reviewed the 9% long term investment return assumption for reasonableness under the guidelines of Actuarial Standard of Practice Number 27. Using a Milliman proprietary model that predicts expected future returns by asset class and develops an overall investment return assumption range (arithmetic and geometric) based on the duration of the liability, Milliman tested some sample expected

17

investment portfolios to determine the likelihood of achieving a 9% long term rate of investment return. Based on a weighted average payment duration of approximately 12 years, and a "traditional" 60% equity 40% fixed income portfolio, Milliman determined that a 9% return represents just under the 75th percentile of expected returns (i.e., the hypothetical portfolios would achieve a compounded annual long-term return of 9% or greater over their lifetime about 25% of the time). More significantly, Milliman reviewed other hypothetical portfolios with investment policies comparable to those of very large pension funds (which would more closely approximate its expectation for an investment policy appropriate for a trust of this size), and found that the 9% return represented just over the 50th percentile of returns (i.e., the hypothetical portfolios would achieve a compounded annual long-term return of 9% or greater over their lifetime about 50% of the time). (Taranto Decl. ¶ 8. )

46. Independent of the UAW, Class Counsel also thoroughly reviewed the fairness, reasonableness, and adequacy of the proposed settlement. To facilitate this review, the UAW and Chrysler granted Class Counsel access to all relevant financial and actuarial materials, including proprietary and confidential financial information and analyses, and to all documents that Class Counsel requested relating to UAW health care. (Payne Decl. ¶ 32.) Class Counsel again considered applicable law and engaged in extensive discussions with UAW experts and Chrysler representatives. (*Id.*) In addition, Class Counsel retained their own experts, reviewed material concerning Chrysler's health care costs, and analyzed relevant health care documents and collective bargaining agreements. (*Id.)* Class Counsel's experts also conferred with UAW's experts about issues of concern to them. (*Id.*)

47.     Based on their investigation, Class Counsel concluded that Chrysler faced ongoing and very serious financial difficulties, and this conclusion was a major factor in their decision to enter into the settlement.  (*Id.* ¶ 33.)  As Class Counsel concluded, no matter how strong their legal claim is on the merits, Class Members are still vulnerable if there is a significant risk that Chrysler will become insolvent and unable to pay the level of benefits that the Class Members anticipate receiving over the next 80 years.  (*Id.*)

48.     To analyze Chrysler's financial prospects, Class Counsel retained John D. Finnerty, Ph.D., Managing Principal of Finnerty Economic Consulting, LLC, and Professor of Finance and Director of the MS in Finance Program at Fordham University in New York.  (*Id.* ¶ 34.)  Dr. Finnerty's Expert Report ("Finnerty Report"), and exhibits and appendices showing his qualifications and listing the materials he considered, are found in the record at Dkt. #41-5.  Using several different metrics, Dr. Finnerty concluded that the likelihood of a Chrysler default on its senior debt is between 22.42 percent and 51.52 percent for a five-year time horizon, between 28.00 percent and 59.29 percent for an eight-year time horizon, between 30.42 percent and 59.29 percent for a 10-year time horizon, and between 35.03 percent and 59.43 percent for a 15-year time horizon as of January 31, 2008.  (*Id.* ¶ 24.)

49.     Based on Dr. Finnerty's evaluation of the possibility of a Chrysler default in the next 15 years, Class Counsel concluded that a discounted settlement worth less than the "full value" that Plaintiffs might win through a court determination would be in the best interest of the class.  (Payne Decl. ¶ 36.)  As Class Counsel explained, they are familiar with cases, including ones where they served as class counsel, where

retirees achieved victories that later became "hollow" because the losing company then filed for bankruptcy.  (Id. ¶36.)

50.     In addition, Class Counsel concluded that a discounted settlement worth less than "full value" also was justified due to the risks of their ultimately losing the litigation.  (*Id.* ¶37)  Class Counsel has extensive experience litigating retiree welfare benefit cases, which often result in years of litigation.  (*Id.* ¶¶19, 22.)  At times, Class Counsel have litigated cases for years and prevailed in the lower court on summary judgment or at trial, only to have the Court of Appeals announce what seemed to be a new standard in reversing judgment and finding for the employer.  (*Id.* ¶19.)  Class Counsel notes that they also are familiar with cases where courts, including those in the Sixth Circuit, have ruled that health benefits for certain groups of union retirees are not vested and may be unilaterally altered by their former employers.  *See, e.g., Maurer v. Joy Technologies, Inc.*, 212 F.3d 907 (6th Cir. 2000); *Bittinger v. Tecumseh Products Co.*, 83 F. Supp. 2d 851 (E.D. Mich. 1998); *Int'l Union v. Cleveland Gear Corp.*, 1983 WL 2174 (N.D. Ohio 1983), *aff'd,* Case No. 83-3839, slip op. (6th Cir. 1984) (Merritt, J.).

51.     In addition to considering the risk of a Chrysler bankruptcy and the risk of losing the lawsuit on the merits, Class Counsel considered (1) the range of expected payments into the VEBA, and (2) the range of anticipated "Amended Plan" benefits that the VEBA can be expected to provide starting in 2012.  (Payne Decl. ¶ 38.)  For these estimates and analysis, Class Counsel relied on the expert advice of health care actuary Adam Reese, FSA, EA, MAAA, and the Hay Group where he is a Senior Consultant.  (*Id.*)  A redacted version of the final Hay Group Report, dated March 4, 2008 and updated June 23, 2008, is found in the record at Dkt. #41-4.

20

52.      Hay Group personnel had full access to the actuarial data available to Milliman and Lazard, as well as to published reports and cash flow projections of Watson Wyatt, an actuarial firm retained by Chrysler.  (Payne Decl. ¶39.)  The Hay Group independently evaluated the actuarial assumptions that were used in the UAW/Chrysler negotiations and independently examined the value of the agreed contributions to the VEBA.  The Hay Group concluded that the actuarial assumptions were within the range of reasonable assumptions for such future experience.  (Hay Group Report.)  And with respect to the agreed contributions, the Hay Group assigned different, and somewhat lower, values to some of the expected contributions than had Lazard and Milliman in their analyses.  (*Id.*)  Finally, the Hay Group developed its own cash flow and financial model to test whether the VEBA assets would be sufficient to provide benefits for as long as the covered retirees and eligible dependents may live. (*Id.*)

53.      According to the Hay Group, because of the new VEBA's extended life, it is difficult to project forward with certainty whether the amounts to be paid into the VEBA will be enough to pay all anticipated benefits for all future years without adding more retiree contributions or reducing benefits.  This is because the VEBA's funds and expenditures are inherently uncertain due to such factors as:

•future investment returns and volatility of returns,

•future healthcare costs and variation of rates of increase,

•changes in Medicare,

•the possibility of government-paid national health benefits,

•mortality experience of the retirees, and

•value of business upon re-issue of publicly traded securities (i.e. new reset warrant).

(*Id.* at 17.)

54.     Considering that uncertainty, the Hay Group estimated how variations in the primary factors would affect the VEBA's ability to provide benefits.  Under certain plausible conditions, the VEBA would be expected to continue providing those benefits for as long as the retirees and dependents are alive to receive them.  Under other conditions, the Hay Group projected that the VEBA Committee would have to reduce benefits at some point in the future in order to continue providing substantial benefits for as long as they will be needed.  (*Id.* at 17-18.)

55.     After considering the Hay Group Report, the Finnerty Report and their own research and experience, and based on their professional experience and judgment, Class Counsel concluded that the possibility that the VEBA may not have all the funding needed to provide Amended Plan benefits at the anticipated levels must be viewed in light of the particular risks inherent in this litigation (e.g., possible Chrysler bankruptcy, chances of losing on the merits) as well as the risks inherent in all class action litigation. (Payne Decl. ¶ 43.)  Class Counsel concluded that Chrysler faced ongoing and very serious financial difficulties, and this conclusion was a major factor in its decision to enter into this settlement.  (*Id.* ¶ 33.)  Class Counsel concluded that if Chrysler had a substantial chance of defaulting on retiree health obligations within five, fifteen, or even twenty-five years, Class Members would be well-served if, rather than bear the continued risk of a default in which they could receive little or nothing, they secure through this lawsuit enough funding immediately to provide for a significant portion of

their future health care benefits (but well under 100% of their current level of benefits).
(*Id.*)

### K.  The Parties' Conclusions Regarding Settlement and the court's Preliminary Approval

56.     Class Counsel and the Class Representatives have determined that the Settlement Agreement is in the best interest of the Class and that the terms of the settlement are fair, reasonable, and adequate.  (Dkt. #41-1.)

57.     The UAW has also concluded that settlement is fair, reasonable and adequate.  (*Id.*)

58.     Finally, Chrysler has concluded the terms of the settlement are fair, reasonable, and adequate, and that it is desirable, beneficial and in the public interest that this action be settled as set forth in the Settlement Agreement.  (Dkt. #42-1.)

59.     On March 31, 2008, the parties filed a joint motion seeking preliminary approval of the proposed class action settlement and Class notices.  (Dkt. #26.)  Also filed with that joint motion was the parties' Settlement Agreement.  (Dkt. #26, Exh. 1.)

60.     After consideration of the briefing and evidentiary support submitted by the parties, as well as the arguments made at hearing, the court preliminarily approved the proposed Settlement Agreement on April 9, 2008, established a comprehensive objection process, and approved the proposed Class notices.  (Dkt. #31-32; *see also* April 9, 2008 Minute Entry.)

### L.  Key Terms of the Proposed Settlement

61.     The Settlement Agreement provides that, after the Implementation Date, all responsibility for providing medical benefits to Class members will permanently shift

from Chrysler to a new retiree health care plan and will be funded by a new VEBA. (Dkt. #26-3, Exh. 1, Settlement Agreement, §5.D.)  The Implementation Date is the later of January 1, 2010 or when all legal challenges to the Settlement are over.  (*Id.* at § 1.)

62.     Any and all obligations of Chrysler to provide retiree medical benefits to Class members will be terminated as of the Implementation Date.  (*Id.* at § 5.D.)  Until the Implementation Date, retiree medical benefits for Class members will continue to be provided by Chrysler (at an estimated cost of $1.5 billion).  (*Id.* at §§ 5.B and 5.C.)

63.     In addition to establishing the new VEBA, the Settlement Agreement, if approved, would also modify existing retiree medical benefits on the date the approval order is issued by the court.  (*Id.* at § 5.A.)  The program of modified coverage is referred to as the "Amended Plan."  (*Id.*)

64.     Chrysler will provide benefits to class members under the Amended Plan until at least January 1, 2010.  (*Id.* at §§ 5.B and 5.C.)  If legal proceedings are completed by then, or once all appeals are final (whichever is later), funding of the benefit plan will shift to the new VEBA.  (*Id.* at § 5.D.)  The Amended Plan includes a requirement that retirees assume a modest amount of additional cost sharing – such as monthly contributions of $11 (single) or $22 (multiple-person family), annual deductibles of $159 (single) or $318 (multiple-person family) and co-insurance amounts of 10% In Network and 30% Out of Network.  (Dkt. #26-13, Exh. I, Amended Plan, §A(ii).) Retirees who do not make the monthly contributions will automatically be enrolled in a plan that provides coverage for catastrophic medical expenses; the catastrophic plan requires no monthly contributions from retirees.  (Dkt. #26-14, Annex 1 to Exhibit I, Group Catastrophic Plan.)  The Amended Plan also has three important safeguards: (1)

out-of-pocket expenses for deductibles and co-insurance cannot exceed annual maximums of $265 (single) or $530 (family) for In Network services, or $530 (single) or $1061 (family) for Out of Network services; (2) amounts of monthly contributions, co-payments, deductibles, and out-of-pocket maximums cannot increase more than 3% yearly under the Amended Plan through December 31, 2011; and (3) retirees or surviving spouses whose annual Chrysler pension is $8,000 or less, with a pension benefit rate of $33.33 or less per month per year of credited service, will not have to pay any monthly contributions or deductibles.  (Dkt. #26-13, Exh. I, Amended Plan, §A.)

65.     The Amended Plan provides a range of benefits for retirees that substantially exceeds the benefits generally available to most other retirees with employer-sponsored retiree health care plans, and at a cost to the retirees that is substantially less than the cost most other retirees pay.  (Dkt. #42-8, Schieber Report, ¶ 11.)

66.     Specifically, the Amended Plan is more generous compared to many other retiree health care plans in the following respects: For Chrysler retirees who choose to participate in the Amended Plan (effective in its current form until at least December 31, 2011), their health insurance coverage will remain one of the most comprehensive employer-sponsored retiree health benefit programs in the United States.  The benefits include coverage for a broad range of inpatient and outpatient services, generic and name-brand prescription drugs and appropriate medical devices for preventive and acute care needs of the participants.  (Dkt. #42-8, Schieber Report, ¶ 11)  This coverage provides those benefits to participants at a cost which is less than the cost borne by most participants in employer-sponsored retiree health programs.  According

to the Kaiser/Hewitt 2006 Survey on Retiree Health Benefits, retirees covered by retiree health benefit plans sponsored by private employers in 2006 paid monthly premiums, on average, of $227 for pre-65 coverage and $110 per month for coverage at age 65 and above, compared to $11 per month required for Class Members who choose to participate in the Amended Plan. (*Id.* ¶ 12) In virtually every cost category, the Amended Plan provides benefits to its covered population at costs significantly below those of the typical retiree plan offered by employers. (*Id.* ¶¶ 14-15)

67.     The new Plan and new VEBA will be administered by an eleven-member Committee that will serve in a fiduciary capacity. (Dkt. #26-3, Exh. 1, Settlement Agreement, §4.A) Chrysler will have no representative on that Committee and will not act for or on behalf of the new Plan or the new VEBA. (*Id.*) From the Implementation Date until December 31, 2011, retiree medical benefits under the new Plan and funded by the new VEBA will continue at essentially the levels of the Amended Plan described above. (*Id.* at § 5.E) Beginning on January 1, 2012, the Committee will have the power to establish new retiree medical benefit levels, including the ability to raise or lower such benefits for Class members based upon actuarial projections of the sufficiency of the VEBA assets to provide benefits over the lifetime of the covered retirees. (*Id.*)

68.     In addition to funding retiree medical benefits to Class members, the new VEBA will also fund retiree medical benefits to the "Covered Group" which includes certain UAW-represented "future retirees" who retire after October 29, 2007 from Chrysler after meeting other criteria spelled out in the Settlement Agreement, as well as their eligible spouses, surviving spouses and dependents. (*Id.* at § 1)

69.     Specifically, the "Covered Group" consists of individuals who fit one the following descriptions:

(i)     all Chrysler Active Employees who had attained seniority as of September 14, 2007, and who retire after October 29, 2007 under the Chrysler-UAW National Agreements, or any other agreement(s) between Chrysler and the UAW, and who upon retirement are eligible for Retiree Medical Benefits under the Chrysler Plan or the New Plan, as applicable, and their eligible spouses, surviving spouses and dependents;

(ii)    all former Chrysler-UAW Represented Employees and all UAW-represented employees who, as of October 29, 2007, remained employed in a previously sold, closed, divested, or spun-off Chrysler business unit, and upon retirement are eligible for Retiree Medical Benefits from Chrysler and/or the Chrysler Plan or the New Plan by virtue of any other agreement(s) between Chrysler and the UAW, and their eligible spouses, surviving spouses and dependents; and

(iii)   all eligible surviving spouses and dependents of a Chrysler Active Employee, or of a former Chrysler-UAW Represented Employee or UAW-represented employee identified in (ii) above, who attained seniority on or prior to September 14, 2007 and die after October 29, 2007 but prior to retirement under circumstances where such employee's surviving spouse and/or dependents are eligible for Retiree Medical Benefits from Chrysler and/or the Chrysler Plan or the New Plan. (*Id.*)

70.     Chrysler is expected to contribute assets to the new VEBA with a present value within a range of approximately $9 to $10 billion as of January 2008, consisting of: (1) a $552 million "Base Amount;" (2) $2.1779304 billion from the "Existing Internal VEBA" that Chrysler maintains to help fund all of its collectively-bargained retiree health care benefits; (3) a $2.5608696 billion Short Term Payment that includes, among other amounts, $839 million representing the value to Chrysler of the agreement by the UAW, on behalf of active employees, to forgo a 3% wage increase for 2009, and $551 million representing the value to Chrysler of the agreement of the UAW, on behalf of active employees, to forgo certain COLA increases that would otherwise have been expected during the term of the 2007 CBA (the Short Term Payment amount is subject to offset for amounts paid by Chrysler to provide Retiree Medical Benefits to the Class and the Covered Group from January 1, 2010 to the Implementation Date); (4) $1.777 billion representing the present value of additional forgone COLA increases; (5) $375 million representing the present value of additional premiums offset by a pension increase; (6) a $1.2108 billion note earning 9% interest, or 11% after 2009, with a maturity of January 1, 2016; (7) up to $487 million in "Shortfall Payments," with the actual amount to depend on whether the new VEBA is projected as of 19 stated dates to become insolvent within 25 years (determined using the Amended Plan benefit levels); and (8) $174 to $605.4 million, as the projected value of a Reset Warrant that CarCo Intermediate HoldCo I, LLC will issue with a term of ten years.  (Dkt. #26-3, Exh. 1, Settlement Agreement, § 8.)

71.     Including the $1.5 billion Chrysler is estimated to spend on retiree medical benefits before January 1, 2010, the total value expected to be dedicated to funding

retiree medical benefits for Class members and the Covered Group will likely be between $10.5 and $11.5 billion, as measured in present value as of January 1, 2008. (Dkt. #26-21, Exh. 3, Proposed Individual Class Notice at 7.)

72.     Under the Settlement Agreement, Chrysler does not provide any guarantee of investment returns on the assets that will fund the new VEBA or whether there will be sufficient assets to fund the current scope and level of benefits during the lifetimes of the covered retirees.  (Dkt. #26-3, Exh. 1, Settlement Agreement, § 6.B.)  If the new VEBA's assets are insufficient to accomplish that goal, the new VEBA's Committee would likely be required to reduce future benefits to Class members and the Covered Group.  (Dkt. #42-8, Schieber Report, ¶19.)

73.     However, most retiree health care plans are pay-as-you go systems and most employers do not pre-fund their future liabilities, thereby leaving vulnerable the financial viability of future benefits.  By contrast, the new VEBA funds the retiree benefits, which makes the new Plan more solvent than many large employer-sponsored retiree health care programs.  (*Id.* at ¶20.)

74.     The Settlement Agreement includes a Trust Agreement, Exhibit G to the Settlement Agreement, which will govern the operation of the new trust established by the parties.  If similar agreements concerning General Motors Corporation and Ford Motor Company are approved, the new trust will also be responsible for UAW/GM and UAW/Ford retiree medical benefits, but billions of dollars more will be contributed by GM and Ford, and three separate accounts will be maintained to pay for the benefits of GM, Chrysler and Ford retirees. Assets contributed for Chrysler's retirees under the

Settlement Agreement will not be available to pay for benefits for GM or Ford retirees, and vice versa. (Dkt. #40-3, Form of Trust Agreement at § 7.1)

75.     The Settlement Agreement provides that the court's final approval order or judgment will approve and incorporate in the order the entirety of the Settlement Agreement in all respects.  (Dkt. #26, Exh. 1, Settlement Agmt. at 1.)  In addition, the Settlement Agreement provides that certain terms and provisions of that agreement must be expressly stated in the court's final approval order or judgment.  (*Id.* §§ 4(A); 5(F); 12(B); 20(A); 23; 24(A); 26(A); 28(B))

### M.  The Settlement Agreement is a Critical Component of Chrysler's Turnaround Plan

76.     As part of its turnaround plan, Chrysler has determined that a final negotiated resolution of its retiree health care obligation is critical to the long-term success and profitability of its business.  (Dkt. #42, Exh. 1, Kolka Decl., ¶ 10.)

77.     The Settlement Agreement provides a permanent solution to the parties' dispute over retiree health care, without the risks and uncertainties of continued litigation.  The settlement also removes the burden to Chrysler's business of administering retiree health care benefits, and provides the certainty of a cap and limit on Chrysler's obligation to pay for such benefits.  (Dkt. #42, Exh. 1, Kolka Decl., ¶ 10; Exh. 2, Hadrych Decl., ¶¶ 7, 10.)  This will clearly benefit Chrysler's business planning and, Chrysler anticipates, will be viewed favorably by investors, lenders and credit rating agencies.  (*Id.*)

78.     Second, and equally important, the Settlement Agreement will substantially improve Chrysler's future prospects.  Conversion of Chrysler's OPEB

health care obligation from an uncertain defined benefit plan to a set of payments that is fixed and capped will result in Chrysler being evaluated for credit purposes upon more favorable criteria.  (*Id.*)  In addition, by establishing an independent trust that will provide and be solely responsible for retiree health care, the Settlement Agreement will free up capital for Chrysler to invest in its core business and new product development.  (*Id.* ¶ 8.)

79.     The Settlement Agreement will also significantly reduce Chrysler's exposure to unexpected short-term inflationary spikes in health care costs that could frustrate the company's competitive initiatives.  (Dkt. #42, Exh. 2, Hadrych Decl., ¶¶ 8, 10.)  Furthermore, the Settlement Agreement will enable Chrysler to utilize surplus pension resources for retiree health care that would otherwise be inaccessible for such purposes.  (Dkt. #26, Exh. 1, § 15.)

80.     Third, Chrysler believes that together with other aspects of its turnaround plan, the settlement eventually will have a positive impact on its financial condition, giving Chrysler greater access to capital markets, improved cash flow and investment flexibility—all of which are essential to the company's long-term success.  (Dkt. #42, Exh. 2, Hadrych Decl., ¶ 10.)

81.     Fourth, although the Settlement Agreement is critical to Chrysler's prospects for success and long-term financial stability, the benefits provided to Class members are among the most desirable among employer plans offered nationally, and would be considerably more secure under the Settlement Agreement than under the current arrangement.  (Dkt. #42, Exh. 3, Schieber Report, ¶ 21.)

82.     Finally, absent a permanent solution, Chrysler will continue to bear the significant competitive, fiscal, and litigation challenges associated with retiree health care costs.  (Dkt. #42, Exh. 1, Kolka Decl., ¶ 9.)  Chrysler has asserted that, without the Settlement Agreement, Chrysler would be compelled to take unilateral action to modify retiree health care benefits.  (Dkt. #26-3, Exh. 1, Settlement Agreement, § 3.)  The UAW and the Class would oppose any such action, and the inevitable result would be prolonged and expensive litigation.  Even if Plaintiffs won such a suit, such a victory could turn Pyrrhic because of the risk that Chrysler would be unable to pay for such benefits.  While Chrysler believes that it would prevail in any such case, there is a risk Chrysler might not.  Moreover, even if Chrysler were ultimately successful in litigation, the delay in obtaining a final resolution of Chrysler's retiree health care obligation, which very likely would take several years, would thwart Chrysler's ability to address its financial difficulties, further eroding the confidence of creditors, investors, financial and credit markets, car buyers and the press.  (*Id.* ¶ 11.)  The Settlement Agreement avoids these problems by addressing and permanently resolving the most significant obstacle facing Chrysler's future.  (*Id.* ¶ 14.)

### N.  The Class Notice

83.     As required by the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1711 et seq., Chrysler has provided the requisite notice of the Settlement Agreement to the appropriate federal and state Attorneys General.  On April 8, 2008, Chrysler sent notice of proposed class settlement to the appropriate federal and state Attorneys General, including the relevant documentation.  On April 15, 2008, Chrysler sent supplemental notice to the appropriate Attorneys General, including among other items

a copy of the court's April 10, 2008 order preliminarily approving the Settlement Agreement. (Dkt. #42, Exh. 6, Litwinski Decl., ¶¶ 3-4.)

84.     Following entry of the court's order preliminarily approving the Settlement Agreement, Chrysler provided notice to Class members by mailing individual Class notices to each household in which a Class member resided. (Dkt. #42, Exh. 4, Fraga Decl., ¶¶ 4-7, 9.) In addition, Chrysler provided notice by publication in the April 19, 2008 weekend edition of the Detroit Free Press, and the April 21, 2008 edition of USA Today. (*Id.* ¶ 11.) Each notice described the terms of the Settlement Agreement and informed Class members of their right to object and the date of the fairness hearing. In addition, the individual notices mailed to Class members included a copy of the entire Settlement Agreement with exhibits (excluding Exh. B, Form of Chrysler Note; Exh. C, Form of New Reset Warrant; and Exh. F, Form of Security Holder and Registration Rights Agreements, which were deemed too large and impractical for direct mail delivery but were made available to Class members upon request or via the internet). (Dkt. #26, Exh. 3 ¶¶ 6, 18; Exh. 4.)

85.     The individual Class notice further informed Class members that a complete copy of the Settlement Agreement, including all exhibits thereto: (i) was available on the Internet; (ii) could be obtained by calling a toll-free number; and (iii) could be inspected during business hours in the Office of the Clerk of the Court, as well as at Class Counsel's and UAW's offices. (Dkt. #26, Exh. 3 ¶ 18.)

86.     Finally, the Class notices specifically informed Class members that they could object to the Settlement Agreement and explained how to make objections. (Dkt. #26, Exh. 3 ¶ 14; *see also* Exh. 4.)

### O. Objections from Class Members

87.     Only eleven Class members—i.e., fewer than one in every 11,000 persons belonging to the Class—submitted objections to the settlement.  (Dkt. #38, Exh. 1; Dkt. #42, Exh. 4, Fraga Decl., ¶ 12.)  Copies of all of the objections received were filed with the court by Class Counsel.  (Dkt. #38, Exh. 1.)

88.     Neither the Attorney General of the United States, nor the Attorney General of any State, has filed any objection to the Settlement Agreement in response to the CAFA notices sent by Chrysler.

### P. Fairness Hearing

89.     The court held a fairness hearing on June 30, 2008.  All parties were represented by counsel, and one objector addressed the court.  (*See* June 30, 2008 Minute Entry (noting Fairness Hearing).)

### II. CONCLUSIONS OF LAW

### A. Jurisdiction

1.      The court has jurisdiction in this action under Section 301 of the LMRA, 29 U.S.C. § 185, and Section 502(e)(1) and (f) of ERISA, 29 U.S.C. § 1132(e)(1) and (f).

### B. Class Certification

2.      To be certified, the proposed class must meet the requirements of Rule 23(a) (i.e., numerosity, commonality, typicality, and adequacy), and one of the three tests in Rule 23(b). *See General Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1992).  Based on the record after the fairness hearing, the court concludes that those requirements are met.

3. **Numerosity**. There are approximately 125,000 individuals in the Plaintiff class, amply satisfying the Rule 23(a)(1) requirement that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1); *see Henry I*, 497 F.3d at 625 (class consisting of 476,676 retirees and dependents was "undoubtedly 'so numerous that joinder of all members is impracticable'" (citation omitted)); *see also Bittinger v. Tecumseh Prods. Co.*, 123 F.3d 877, 884 n.1 (6th Cir. 1997) (objection to numerosity requirement in 1,000-member class was "frivolous"); *Reese v. CNH Am. LLC*, 227 F.R.D. 483, 486 (E.D. Mich. 2005) (certifying claims of 1,400 retirees); *Rankin v. Rots*, 220 F.R.D. 511, 517 (E.D. Mich. 2004) (certifying ERISA claims for class alleged to be in the "thousands").

4. **Commonality**. The Rule 23(a)(2) requirement of commonality "'simply requires a common question of law or fact.'" *Reese*, 227 F.R.D. at 487 (quoting *Bittinger*, 123 F.3d at 884). "The interests and claims of the various Plaintiffs need not be identical. Rather, the commonality test is met when there is at least one issue whose resolution will affect all or a significant number of the putative class members." *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 424 (6th Cir. 1998).

5. Whether Chrysler has a unilateral right to modify retiree benefits is a question of law common to the Class. *See Henry I*, 497 F.3d at 625 ("because the claims of all retirees stem[med] from the collective bargaining agreements negotiated between [the defendant] and the UAW, they share[d] 'common' 'questions of law or fact'" (citation omitted)); *Bittinger*, 123 F.3d at 879, 884 (finding commonality where retirees sought guaranteed lifetime, fully-funded benefits, even though a series of different CBAs governed those benefits); *Reese*, 227 F.R.D. at 487 (commonality

established even though Plaintiffs retired at different times and under different CBAs);
*Fuller v. Fruehauf Trailer Corp.*, 168 F.R.D. 588, 596 (E.D. Mich. 1996) (evaluation of
effect of defendants' reservation of rights provides common question satisfying Rule
23(a)(2)).

6.    **Typicality**.  A "'plaintiff's claim is typical if it arises from the same event or
practice or course of conduct that gives rise to the claims of other class members, and if
his or her claims are based on the same legal theory.'"  *In re Am. Med. Sys.*, 75 F.3d
1069, 1082 (6th Cir. 1996) (quoting 1 Herbert B. Newberg & Alba Conte, Newberg on
Class Actions, § 3-13, at 3-76) ("Newberg").  As with commonality, the typicality
requirement is not an onerous one; so long as there is a strong similarity of legal
theories, the requirement is met "even if substantial factual distinctions exist between
the named and unnamed class members."  *Rankin*, 220 F.R.D. at 518; *see also
Bittinger*, 123 F.3d at 884-85; *Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1106 (5th
Cir. 1993).

7.    Here, Plaintiffs claim that Chrysler's planned unilateral modifications to
retiree health care benefits violate its obligations under ERISA and its contractual
obligations under the CBAs.  That claim, asserting a uniform obligation by Chrysler,
satisfies typicality, notwithstanding any possible factual variations with respect to
individual class members.  *See Henry I*, 497 F.3d at 625 ("[T]he claims of the class
representatives – that the retirees' healthcare benefits are vested under ERISA and the
LMRA – generally are 'typical' of the claims of every other member of the class."
(citation omitted)); *Bittinger*, 123 F.3d at 884 (holding that a claim that the defendant

"originally planned to provide lifetime, fully-funded benefits to retirees" satisfies typicality); *see also Reese*, 227 F.R.D. at 487; *Rankin*, 220 F.R.D. at 518.

8.    **Adequacy**.  The Sixth Circuit has identified two criteria for determining whether class representatives are adequate: "1) [t]he representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel."  *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525 (6th Cir. 1976).  Here, Class Representatives have the same, common interest in protecting retiree health care benefits, and there is nothing to suggest that they would not vigorously protect the interests of the Class.  *See Amchem*, 521 U.S. at 625-26 (stating that class members must "'possess the same interest and suffer the same injury'" to meet the Rule 23(a)(4) adequacy requirement); *Henry I*, 497 F.3d at 626 (absent class members would be adequately represented when the named representatives were "part" of each class and all class members shared a common claim so that their legal interests paralleled the named representatives' interests).

9.    There are no potential intra-class conflicts that would jeopardize adequate representation or prevent class certification.  In this regard, "it is well settled that only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status."  *Georgia State Conference of Branches of NAACP v. Georgia*, 99 F.R.D. 16, 34-35 (S.D. Ga. 1983) (citing Federal Practice and Procedure ("Fed. Prac. & Proc.")) § 1768; *see also Mueller v. CBS, Inc.*, 200 F.R.D. 227, 238 (W.D. Pa. 2001).  Hence, mere "differences in the interests of the class representatives and the other class members is not dispositive under Rule 23(a)(4).  The key question is whether their

37

interests are antagonistic." *Steiner v. Equimark Corp.*, 96 F.R.D. 603, 610 (W.D. Pa. 1983) (emphasis in original); *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625-26 (5th Cir. 1999) ("Differences between named plaintiffs and class members render the named plaintiffs inadequate representatives only if those differences create conflicts between the named plaintiffs' interests and the class members' interests."); *Walters v. Reno*, 145 F.3d 1032, 1046 (9th Cir. 1998) (factual variations among class members do not defeat adequacy where they are united in seeking relief on behalf of the class).

10.     In evaluating the adequacy of potential class counsel, Rule 23(g)(1)(l) requires that the court consider:  (a) the work counsel has done in identifying or investigating potential claims in the action, (b) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action, (c) counsel's knowledge of the applicable law, and (d) the resources counsel will commit to representing the class.

11.     Class Counsel in this case are well qualified, more than adequate to the task, and have the resources to commit to representing the Class.  *See Henry I*, 497 F.3d at 626 (finding Attorney Payne competent, qualified, and prepared to handle the litigation).  Class Counsel have extensive knowledge of the law relating to retiree benefits litigation, and have years of experience litigating dozens of actions of this kind. These cases include *Armistead v. Vernitron Corp.*, 944 F.2d 1287 (6th Cir. 1991); *Asarco, Inc. v. United Steel Workers of America*, 2005 U.S. Dist. LEXIS 20873 (D. Ariz. July_26, 2005); *Bower v. Bunker Hill Co.*, 725 F.2d 1221 (9th Cir. 1984), *on remand*, 114 F.R.D. 587, 675 F. Supp. 1254 (E.D. Wash. 1986); *Crown Cork & Seal v. United*

*Steelworkers of America*, 32 E.B.C. 1950, 2004 U.S. Dist. LEXIS 760 (W.D. Pa. 2004);

*Keffer v. H. K. Porter Co.*, 872 F.2d 60 (4th Cir. 1989) (affirming 110 CCH Lab. Cases

¶10,878 (S.D.W.V., April 19, 1988)); *Mamula v. Satralloy*, 578 F. Supp. 563 (S.D. Ohio

1983); *Mioni v. Bessemer Cement Co.*, 4 E.B.C. 2390 (W.D. Pa. 1983), *later decision*,

120 LRRM 2818 (W.D. Pa. 1984), and 6 E.B.C. 2677, 123 LRRM 2492 (W.D. Pa.

1985), *later decision*, 700 F. Supp. 267 (W.D. Pa. 1988); *Policy v. Powell Pressed Steel

Co.*, 770 F.2d 609 (6th Cir. 1985), *cert. denied*, 475 U.S. 1017 (1986); *Rexam, Inc. v.

United Steelworkers of Am.*, 31 E.B.C. 2562 (D. Minn. 2003), *later proceedings*, 2005

WL 2318957 (D. Minn. 2005); *Senn v. United Dominion*, 951 F.2d 806 (7th Cir. 1992),

*petition for rehearing denied*, 962 F.2d 655 (1992), *cert. denied*, 509 U.S. 903 (1993);

*Shultz v. Teledyne*, 657 F. Supp. 289 (W.D. Pa. 1987); *Smith v. ABS Industries*, 890

F.2d 841 (6th Cir. 1989); *Steelworkers v. Connors Steel Co.*, 855 F.2d 1499 (11th Cir.

1988); *Steelworkers v. Textron, Inc.*, 836 F.2d 6 (1st Cir. 1987).

12.    **Rule 23(b)(2).**  Finally, the Class may be certified under Rule 23(b)(2) in

that "the party opposing the class has acted or refused to act on grounds generally

applicable to the class, thereby making appropriate final injunctive relief or

corresponding declaratory relief with respect to the class as a whole."  Fed. R. Civ. P.

23(b)(2).  These requirements are met when "the common claim is susceptible to a

single proof and subject to a single injunctive relief."  *Senter*, 532 F.2d at 525.  Courts

routinely certify claims challenging an employer's modification of health care benefits

under Rule 23(b)(2), holding that, in such cases, the employer's alleged conduct is

directed at the class as a whole and hence class-wide injunctive or declaratory relief is

appropriate.  *See Henry I*, 497 F.3d at 625 ("[Defendant] has threatened to modify all

39

retiree healthcare benefits unilaterally, 'thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole'" (citation omitted)); *Forbush*, 994 F.2d at 1106; *Fox v. Massey-Ferguson, Inc.*, 172 F.R.D. 653, 665 (E.D. Mich. 1995) ("[I]t is abundantly clear that the . . . decision by [the defendant] with regard to the then-existing health care benefits affected the entire proposed class, thus making the issue of a permanent injunction and corresponding declaratory relief facially appropriate."); *Halford*, 161 F.R.D. at 20 (certifying claim that defendant has a contractual obligation to provide lifetime health care benefits to retirees and eligible spouses).  Plaintiffs' claims in this case are all based on the contested question of whether Chrysler may unilaterally modify retirees' health care benefits – claims which are "susceptible to a single proof and subject to a single injunctive remedy," and hence are properly certified under Rule 23(b)(2).  *Senter*, 532 F.2d at 525.

13.     Accordingly, the court will grant final certification of the Class defined in Paragraph 10 of the Findings of Fact.

### C. Final Approval of the Settlement Agreement

14.     The court evaluates the proposed Settlement Agreement in light of the general federal policy favoring the settlement of class actions.  *See Henry I*, 497 F.3d at 632; *Clark Equip. Co. v. Int'l Union, Allied Indus. Workers*, 803 F.2d 878, 880 (6th Cir. 1986) (per curiam); *Franks v. Kroger Co.*, 649 F.2d 1216, 1224 (6th Cir. 1981), *vacated and modified on other grounds*, 670 F.2d 71 (6th Cir. 1982); *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 530 (E.D. Mich. 2003); *Berry v. Sch. Dist.*, 184 F.R.D. 93, 97 (W.D. Mich. 1998).

15.     Given this well-settled policy, "a district court's role in evaluating a private consensual agreement 'must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned.'" *Clark Equip. Co.*, 803 F.2d at 880 (*quoting Officers For Justice v. Civil Service Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982)); *Berry*, 184 F.R.D. at 97 ("The court's role...'is properly limited to the minimum necessary to protect the interests of the class and the public.'"); *Shy v. Navistar Int'l Corp.*, 1993 U.S. Dist. LEXIS 21291 (S.D. Ohio May 27, 1993); *Bronson v. Board of Educ.*, 604 F. Supp. 68, 78 (S.D. Ohio 1984); Fed. R. Civ. P. 23(e)(1)(C) (stating that court may approve class settlement "on finding that it is fair, reasonable, and adequate").

16.     Because the very point of compromise is to avoid determining contested issues and to avoid the expense and uncertainty of litigation, the court should not "decide the merits of the case or resolve unsettled legal questions." *Carson v. Am. Brands*, 450 U.S. 79, 88 n.14 (1981); *Henry I*, 497 F.3d at 631(inquiry into fairness of settlement "understandably does not require us to 'decide the merits of the case or resolve unsettled legal questions'") (citation omitted); *Clark Equip. Co.*, 803 F.2d at 880 (a court should not examine "the factual or legal disputes which underlie the merits of the dispute"); *Robinson v. Ford Motor Co.*, 2005 U.S. Dist. LEXIS 11673, at *12 (S.D. Ohio 2005); *In re Telectronics Pacing Sys., Inc.*, 137 F. Supp. 2d 985, 1027 (S.D. Ohio 2001); *Huguley v. Gen. Motors Corp.*, 128 F.R.D. 81, 87-88 (E.D. Mich. 1989).

17.     Nor should the court engage in the "'detailed and thorough investigation that it would undertake if it were actually trying the case.'" *Berry*, 184 F.R.D. at 98; Fed.

41

Prac. & Proc. § 1797.5 ("The court may not try disputed issues in the case since the whole purpose behind a compromise is to avoid a trial. Rather the judge is restricted to determining whether the terms proposed are fair and reasonable.").

18. In evaluating a proposed class settlement, the court "may limit the fairness hearing 'to whatever is necessary to aid it in reaching an informed, just and reasoned decision.'" *Tenn. Ass'n of Health Maint. Orgs.*, 262 F.3d 559, 567 (6th Cir. 2001); *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1976); *Ass'n for Disabled Ams., Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 467 (S.D. Fla. 2002) ("Even when the Court becomes aware of one or more objecting parties, the Court is not 'required to open to question and debate every provision of the proposed compromise.'"); 4 Newberg § 11:57 ("The court, in its discretion, may limit the discovery or presentation of evidence to that which may assist it in determining the fairness and adequacy of the settlement.").

19. Courts have identified a series of factors that assist in weighing the potential risks and rewards inherent in going forward with litigation against the certainty of a compromise solution:

> (i)  the likelihood of success on the merits weighed against the amount and form of the relief offered in the settlement;
>
> (ii)  the risks, expense, and delay of further litigation;
>
> (iii)  the judgment of experienced counsel who have competently evaluated the strength of their proofs;
>
> (iv)  the amount of discovery completed and the character of the evidence uncovered;
>
> (v)  whether the settlement is fair to the unnamed class members;

(vi) objections raised by class members;

(vii) whether the settlement is the product of arm's length negotiations as opposed to collusive bargaining; and

(viii) whether the settlement is consistent with the public interest.

*See In re Cardizem*, 218 F.R.D. at 522; *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992); *Williams v. Vukovich*, 720 F.2d 909, 922-23 (6th Cir. 1983); *Berry*, 184 F.R.D. at 98; *Robinson*, 2005 U.S. Dist. LEXIS 11673, at *13.

20. The court may choose to consider only those factors that are actually relevant to the settlement at hand, and may weigh particular factors according to the demands of the case. *Granada Invs., Inc.*, 962 F.2d at 1205-06.

### D. The Relevant Factors

### 1. Likelihood of Success on the Merits

21. A significant factor in the court's evaluation of a proposed settlement is the likelihood of success on the merits weighed against the relief offered by the settlement. *See General Tire & Rubber Co. Sec. Litig.*, 726 F.2d 1075, 1086 (6th Cir. 1984); *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1150 (8th Cir. 1999); *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996); 2 Newberg §11:44 (3d ed. 1992).

22. Although this factor requires "'some evaluation of the merits of the dispute, the district court must refrain from reaching conclusions upon issues which have not been fully litigated.'" *Berry*, 184 F.R.D. at 98. The critical question is "whether the interests of the class as a whole are better served if the litigation is resolved by the settlement rather than pursued." *In re Cardizem*, 218 F.R.D. at 522; *see also Shy*, 1993 U.S. Dist. LEXIS 21291, at *11 ("It is neither required, nor is it possible for a court to

43

determine that the settlement is the fairest possible resolution of the claims of every individual class member; rather, the settlement, taken as a whole, must be fair, adequate and reasonable.").

23.     In assessing the relative risk and benefits of the settlement, the court must not "'decide the merits of the case or resolve unsettled legal questions.'" *Henry I*, 497 F.3d at 631 (*quoting Carson*, 450 U.S. at 88 n.14).  "The question rather is whether the parties are using settlement to resolve a legitimate legal and factual disagreement." *Henry I*, 497 F.3d at 632.

24.     The parties' claims and defenses in this case turn on the same question that was addressed by this court, and later by the Sixth Circuit, in *Henry I*:  "Do the collective-bargaining agreements vest former union workers with their healthcare benefits upon retirement?"  *Henry I*, 497 F.3d at 631.  As in *Henry I*, the parties' fundamental disagreement on the answer to that question is a "legitimate legal and factual disagreement" appropriate for settlement.  497 F.3d at 632; *Henry I*, 2006 WL 891151, at *15 ("The ultimate issue in this case is whether retiree health care benefits are vested, an issue upon which the plaintiffs and defendant have historically been, and remain, deeply divided.").

25.     The Sixth Circuit has summarized the parties' competing answers to this question as follows:

> "The retirees and the UAW point to the *Yard-Man* line of cases as support for their position that the retirees' healthcare benefits vested upon retirement.  *See Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Yard-Man, Inc.*, 716 F.2d 1476, 1482 (6th Cir. 1983) (holding that there was "sufficient evidence" of intent to vest retirees with benefits "in the language of [the] agreement itself"); *see also Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. BVR*

44

> *Liquidating, Inc.,* 190 F.3d 768, 773-74 (6th Cir. 1999); *Smith v. ABS Indus., Inc.*, 890 F.2d 841, 846 (6th Cir. 1989) . . .
>
> GM and Ford invoke the *Sprague* line of cases-to the effect that "an employer's commitment to vest" must be stated "in clear and express language" in the plan documents. *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 400 (6th Cir. 1998) (en banc) (internal quotation marks omitted). Consistent with these cases, they argue, a reservation of rights to modify retiree healthcare benefits is inconsistent with the claim that those benefits have irreversibly vested, *see Maurer v. Joy Techs., Inc.*, 212 F.3d 907, 919 (6th Cir. 2000); *BVR Liquidating*, 190 F.3d at 773.

*Henry I*, 497 F.3d at 631 (certain citations omitted). The parties in this case have advanced similar arguments, demonstrating to the court's satisfaction that they are in fundamental and irreconcilable disagreement on the question whether the retirees' rights to medical benefits are vested under the Chrysler collective bargaining agreements.

26. In sum, the court's task "is not to decide whether one side is right or even whether one side has the better of these arguments." *Id.* at 632. Otherwise, the court would "be compelled to defeat the purpose of a settlement in order to approve a settlement." *Id.* Rather, the court should determine whether the parties are using settlement to resolve a legitimate legal and factual disagreement.

27. Plaintiffs have concluded that risk of loss, even if unlikely, would produce consequences so grave that they counsel entering into a settlement that continues comprehensive health care benefits for the Class. *See Enter. Energy Corp. v. Columbia Gas Transmission Corp.*, 137 F.R.D. 240, 246 (S.D. Ohio 1991) ("'[C]lass counsel and the class representatives may compromise their demand for relief in order to obtain substantial assured relief for the plaintiffs' class.'"); *Priddy v. Edelman*, 883 F.2d 438, 447 (6th Cir. 1989) ("The fact that the plaintiff might have received more if the case had

been fully litigated is no reason not to approve the settlement."); *In re Rent-Way Sec. Litig.*, 305 F. Supp. 2d 491, 509 (W.D. Pa. 2003) ("As is true in any case, the proposed Settlement 'represents a compromise in which the highest hopes for recovery are yielded in exchange for certainty and resolution.") (citation omitted); *Schaefer v. Tannian*, 895 F. Supp. 175, 178 (E.D. Mich. 1995) ("The court need not disapprove the settlement because a plaintiff might have received more if the case had been fully litigated."); *Brown v. Steinberg*, 1990 U.S. Dist. LEXIS 12561, at *6-8 (S.D.N.Y. 1990) (holding that class settlements may be approved though they are only a fraction of the potential recovery, collecting cases).

28.     Courts routinely recognize that settlements never equal the full value of the loss claimed by the plaintiffs.  "In fact there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery."  *Weinberger v. Kendrick*, 698 F.2d 61, 65 (2d Cir. 1982) (approving class settlement where "recovery will be only a negligible percentage of the losses suffered by the class"); *Lazy Oil Co. v. Witco Corp.*, 95 F. Supp. 2d 290, 339 (W.D. Pa. 1997) (collecting cases where courts approved class action settlements providing from 0.2 percent to 16 percent of potential recovery), *aff'd*, 166 F.3d 581 (3rd Cir. 1999).

29.     Moreover, "[a] just result is often no more than an arbitrary point between competing notions of reasonableness."  *In re Corrugated Container Antitrust Litig. (II)*, 659 F.2d 1322, 1325 (5th Cir. 1981); *see also Lazy Oil Co.*, 95 F. Supp. 2d at 338. Thus, in assessing the Settlement Agreement, the court must simply determine "whether it falls within the 'range of reasonableness,' not whether it is the most

favorable possible result in the litigation." *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 319 (N.D. Ga. 1993).

30.     Here, the court concludes that the proposed settlement falls well within this range of reasonableness, and that the benefits to the Class from the Settlement Agreement are substantial.

31.     The benefits to the Class from the Settlement are substantial. The Settlement accomplishes necessary cost savings for Chrysler while maintaining virtually the same comprehensive level of coverage for Class Members with only a slight increase in their share of the cost.  Indeed, the evidence establishes that the Amended Plan provides a range of benefits for retirees that substantially exceeds the benefits generally available to most other retirees with employer-sponsored retiree health care plans, and at a cost that is substantially less than the cost most other retirees pay.

32.     The court concludes that the benefits provided to Plaintiffs -- continued comprehensive health care benefits with only a modest increase in cost -- are fair, reasonable, and adequate when weighed against the uncertainties of litigation and the risks posed by Chrysler's undisputed distressed financial condition.

33.     Although cost increases entailed by the settlement are modest, some individual class members will face hardship as a result of these new charges. Such hardship is regrettable but inevitable. The potential loss of *all* benefits, due to either Chrysler's financial collapse or Chrysler's prevailing on the merits, would be far more harsh for Class Members.

34.     All of the experts who have provided evidence of their efforts to model the sufficiency of the negotiated funding of the VEBA agree that it is not possible to predict

with certainty whether the funding for the new VEBA will be sufficient to accomplish Plaintiffs' objective in negotiating the terms for this settlement, namely, to provide benefits at the levels in the Amended Plan (except for an assumed increase in the cap on annual increases in retiree cost from 3 to 4 percent in 2016) for the lifetimes of the entire Class and the Covered Group. Different assumptions and different models produced different projections, but all of the experts agreed that the principal actuarial assumptions that were used in negotiating the VEBA funding were within a range of reasonableness. Only future experience will tell which of those assumptions are realized.

35. The court has given careful consideration, in accordance with the urging of the United States Department of Labor (as the parties reported in their memoranda supporting the motion for final approval), to the report of Adam Reese. His report states that under certain plausible conditions, the VEBA would be expected to continue providing benefits at the current levels for as long as the Class members are alive to receive them. Under other plausible conditions, his report projects that the VEBA Committee would have to reduce benefits at some point in the future in order to continue providing substantial benefits for as long as they will be needed. If benefit reductions of any magnitude prove to be necessary in the future, those reductions would undoubtedly create some hardship for Class members, and the court is sensitive to that hardship. Nonetheless, the court has concluded that in the absence of the settlement, the class faces greater risks of future benefit reductions or even termination of those benefits. Under these circumstances the court concludes that the settlement is fair, reasonable, and adequate for the class.

## 2. The Risks, Expense and Delay of Further Litigation

36.     Complex litigation of claims similar to those asserted by Plaintiffs in this case is costly and time-consuming, as demonstrated by previous cases in this circuit involving modifications to retiree benefits.  For example, the *Sprague* lawsuit was filed in 1989, and was not resolved for another nine years.  *See Sprague v. General Motors Corp.*, 768 F. Supp. 605, 607 (E.D. Mich. 1991) (noting 1989 filing of action);  *Sprague*, 133 F.3d 388 (decision of Sixth Circuit in 1998).  Similarly, in *Yard-Man*, the dispute over the vesting of retiree medical benefits that began in 1977 was not resolved until 1983.  *See Yard-Man*, 716 F.2d at 1478.  The obvious costs and uncertainty of such lengthy and complex litigation weigh in favor of settlement.  *See In re Cincinnati Policing*, 209 F.R.D. 395, 400 (S.D. Ohio 2002) ("[T]he Court has no doubt that the trial of this class action would be a long, arduous process requiring great expenditures of time and money on behalf of both the parties and the court . . . .  The prospect of such a massive undertaking clearly counsels in favor of settlement.") (internal quotation marks and citations omitted); *Robinson*, 2005 U.S. Dist. LEXIS 11673, at *14.

37.     Given Chrysler's current financial struggle, the delay necessary to further litigate the dispute would benefit no one.  For Chrysler, success at litigation may come too late to effect the turnaround essential to its continued viability.  Moreover, all the parties recognize that absent this settlement, Chrysler may be unable to continue to provide retiree health care benefits to the Class.

38.     In short, success at litigation (for either side) may prove illusory, a prospect that makes settlement a reasonable course.  *See In re Rio Hair Naturalizer Prods. Liab. Litig.*, 1996 U.S. Dist. LEXIS 20440, at *40-41 (E.D. Mich. Dec. 20, 1996)

("[A] victory by Plaintiffs at trial, given Defendants' limited funds, would be pyrrhic."); *In re Milken & Assocs.*, 150 F.R.D. at 55-56; *Shy*, 1993 U.S. Dist. LEXIS 21291, at *46; *Oppenlander v. Standard Oil Co.*, 64 F.R.D. 597, 624 (D. Colo. 1974) ("[T]he Court should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation. In this respect, 'It has been held proper to take the bird in the hand instead of a prospective flock in the bush.'").

### 3. The Judgment of Experienced Counsel Who Have Competently Evaluated the Strength of Their Proofs

39. Class Counsel here fully support the proposed Settlement Agreement. The endorsement of the parties' counsel is entitled to significant weight, and supports the fairness of the Class settlement. It is "well recognized that the court should defer to the judgment of experienced counsel who has competently evaluated the strength of the proofs." *Mich. Hosp. Ass'n v. Babcock*, 1991 U.S. Dist. LEXIS 2058, at *6 (W.D. Mich. Feb. 11, 1991); *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001); *Cotton v. Hinton*, 559 F.2d 1326, 1330 (11th Cir. 1977) ("[T]he trial court is entitled to rely upon the judgment of experienced counsel for the parties."); *Robinson*, 2005 U.S. Dist. LEXIS 11673, at *15-16; *Berry*, 184 F.R.D. at 104 ("[T]he court generally will give deference to plaintiffs' counsel's determination to settle a case."); Manual for Complex Litigation (3d) § 30.42; Newberg § 11.47.

40. Where, as here, counsel are reputable practitioners and experienced in complex class action litigation, their collective judgment in favor of the settlement is entitled to considerable weight. *See Ass'n for Disabled Ams.*, 211 F.R.D. at 467 ("[T]he

Court must rely upon the judgment of experienced counsel and, absent fraud, 'should be hesitant to substitute its own judgment for that of counsel.'").

### 4. The Amount of Discovery Completed and the Nature of the Evidence Uncovered

41.     In considering whether there has been sufficient discovery to permit Plaintiffs to make an informed evaluation of the merits of a possible settlement, the court should take account not only of court-refereed discovery but also informal discovery in which parties engaged both before and after litigation commenced. *See Levell v. Monsanto*, 191 F.R.D. 543, 557 (S.D. Ohio 2000) (although little formal discovery was conducted, class counsel retained experts and conducted informal discovery before negotiating the settlement agreement).

42.     Thus, the absence of formal discovery is not unusual or problematic, so long as the parties and the court have adequate information in order to evaluate the relative positions of the parties. *See Newby*, 394 F.3d at 306 ("'Formal discovery [is not] a necessary ticket to the bargaining table.'"); *Cotton*, 559 F.2d at 1332 (upholding settlement despite fact that little formal discovery had been conducted; "[b]eing an extra judicial process, informality in the discovery of information is desired"); *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 159 (4th Cir. 1991) ("[D]ocuments filed by plaintiffs and evidence obtained through informal discovery yielded sufficient undisputed facts" to evaluate the settlement); *Robinson*, 2005 U.S. Dist. LEXIS 11673, at *14-15 (approving settlement without formal discovery); *Woodward v. Nor-Am Chem. Co.*, 1996 U.S. Dist. LEXIS 7372, at *64 (S.D. Ala. May 16, 1996).

43.     Moreover, the court need not possess sufficient "evidence to decide the merits of the issue, because the compromise is proposed in order to avoid further litigation."  Newberg § 11:45; *In re Rio Hair Naturalizer*, 1996 U.S. Dist. LEXIS 20440, at *39-40.  Instead, this court need only have "'sufficient facts before [it] to intelligently approve or disapprove the settlement.'"  *Epstein v. Wittig*, 2005 U.S. Dist. LEXIS 31078, at *23-24 (D. Kan. Dec. 2, 2005); *Gen. Tire & Rubber*, 726 F.2d at 1084 n.6.  Here, the court has substantial familiarity not only with the claims of the parties and the facts and arguments underlying their respective positions, but also with the nature and conduct of the settlement negotiations and the parties' informal but comprehensive exchange of information.

44.     The evidence demonstrates that there was full disclosure in this case by Chrysler to Plaintiffs of Chrysler's business and financial condition, Chrysler's health care liability, and the relevant CBAs and health care plan documents.  Both UAW and the Class selected experts and undertook independent analyses of Chrysler's financial condition and legal position.  There was significant information available to the parties to negotiate their compromise, and there is more than an adequate basis and evidentiary record on which the court can assess the parties' agreement.

### 5.  The Settlement is Fair to the Unnamed Class Members

45.     Courts may scrutinize settlements to determine whether absent class members have lost out in favor of attorneys and named class members.  In this case, the Class is cohesive and the Settlement Agreement affects all similarly-situated Class members in the same manner.  No preference is granted to the Class Representatives under the settlement and, because all Class members have a unitary interest in seeking

the best possible benefits for retirees, there is no risk of an undue burden on absent

Class members. *See Heit v. Van Ochten*, 126 F. Supp. 2d 487, 490-91 (W.D. Mich.

2001); 5-23 Moore's Federal Practice § 23.164.

### 6. The Very Few Objections Raised by Class Members Supports Approval of the Settlement

46.     "A court should not withhold approval of a settlement merely because

some class members object." *Mich. Hosp. Ass'n*, 1991 U.S. Dist. LEXIS 2058, at *10;

*see also Robinson*, 2005 U.S. Dist. LEXIS 11673, at *16;  *Reed v. Rhodes*, 869 F.

Supp. 1274, 1281 (N.D. Ohio 1994); *Enter. Energy Corp.*, 137 F.R.D. at 246; Fed. Prac.

& Proc. § 1797. 1 ("[T]he fact that there is opposition does not necessitate disapproval

of the settlement.").  This is because even though the court must evaluate any

objections, it "has an obligation to protect the interests of the silent class majority,

despite vociferous opposition by a vocal minority to the settlement." *Id*. at *10.

47.     In this case, Chrysler provided notice to the Class by mail and by

publication.  The Notice was easily understood, succinctly and accurately summarized

the terms of the Settlement Agreement, and informed Class members of their rights –

including their right to object to the Settlement Agreement.  This notice was the best

practicable under the circumstances and fully satisfied the requirements of Fed. R. Civ.

P. 23 and the requirements of due process.  After this notice was provided, only 11 out

of approximately 125,000 Class members (i.e., less than 1 in 11,000) submitted an

objection to the Settlement Agreement.

48.     The minimal level of opposition supports the finding that the settlement is

fair, reasonable, and adequate.  *See Robinson*, 2005 U.S. Dist. LEXIS 11673, at *17

("[A] relatively small number of class members who object is an indication of a settlement's fairness") (citing Newberg § 11.48); *In re Cardizem*, 218 F.R.D. at 527 ("If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement."); *Petrovic*, 200 F.3d at 1152 (approving settlement where objectors represented fewer than 4 percent of the class); *Taifa v. Bayh*, 846 F. Supp. 723, 728 (N.D. Ind. 1994) (class settlement approved despite objections from more than 10 percent of class).

### 7.  The Settlement Was the Product of Arm's-Length Negotiations

49.    Courts presume the absence of fraud or collusion unless there is evidence to the contrary.  *See In re Rio Hair Naturalizer*, 1996 U.S. Dist. LEXIS 20440, at *43 ("Courts respect the integrity of and presume good faith in the absence of fraud or collusion in settlement negotiations, unless someone offers evidence to the contrary."); *Granada Invs., Inc.*, 962 F.2d at 1205 ("Absent evidence of fraud or collusion, such settlements are not to be trifled with."); *Hemphill v. San Diego Ass'n of Realtors, Inc.*, 225 F.R.D. 616, 621 (S.D. Cal. 2004); Newberg (4th) § 11:51.  There have not even been any allegations of fraud or collusion in this case.

50.    Instead, as described above, there is an ongoing adversarial relationship between Plaintiffs and Chrysler with respect to the question of Chrysler's asserted right to unilaterally change, modify, or terminate retiree health care benefits, and the parties are in fundamental and irreconcilable disagreement on this issue.  Further, if the settlement agreement itself is fair, reasonable and adequate, then the court may assume that the negotiations were proper and free of collusion.  *See Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 152 (S.D. Ohio 1992) ("In essence, under this test, if the terms of

the proposed settlement are fair, then the court may assume the negotiations were proper."); *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 212 (5th Cir. 1981) ("It is, ultimately, in the settlement terms that the class representatives' judgment and the adequacy of their representation is either vindicated or found wanting."); *Hemphill*, 225 F.R.D. at 620; *Land v. United Tel. Se., Inc.*, 1997 U.S. Dist. LEXIS 7490, at *5 (E.D. Tenn. Mar. 14, 1997); *Woodward*, 1996 U.S. Dist. LEXIS 7372, at *66-67; *Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co.*, 834 F.2d 677, 684 (7th Cir. 1987) ("The proof of the pudding was indeed in the eating.").

### 8. *The Public Interest*

51.     The evidence submitted by Chrysler amply catalogues the impact of Chrysler's continued viability on the economy of southeast Michigan, the State as a whole, and the nation.  The delay and risks of litigation have an impact not only on Chrysler, the UAW, and the Class, but also on the families, businesses, and communities that depend on Chrysler's continued competitiveness and viability.  The court concludes that those interests are advanced by the Settlement Agreement.  The Settlement Agreement serves the public interest also by conserving the resources of the parties and the court, and by promoting the "strong public interest in encouraging settlement of complex litigation and class action suits."  *In re Cardizem*, 218 F.R.D. at 530; *Lipuma v. Am. Express Co.*, 2005 U.S. Dist. LEXIS 38010, at *77 (S.D. Fla. 2005) ("'[S]ettlement will alleviate the need for judicial exploration of these complex subjects, reduce litigation cost, and eliminate the significant risk that individual claimants might recover nothing.'").  Furthermore, absent this settlement, in the event that Chrysler goes

bankrupt, it is possible that the over 125,000 Class members would be left without any company-provided retiree medical benefits.

### E. Objections to the Settlement Agreement

52.     As noted above, out of a class of approximately 125,000 individuals, only eleven have objected to the Settlement Agreement.  This is far fewer than the number of objections received in other cases where settlements have been approved.  *See, e.g., Henry I*, 2006 U.S. Dist. LEXIS 14890, at *62 (approving 2006 GM retiree medical settlement where "less than three-tenths of one percent" objected, which this court described as "evidence of class members' general acceptance and support for the Settlement Agreement."); *see also Robinson v. Ford Motor Co.*, No. 04-844, 2005 U.S. Dist. LEXIS 11673, at *17 (S.D. Oh. Jun. 15, 2005) (noting that the "relatively small number of class members who object is an indication of a settlement's fairness") (citing Newberg on Class Actions § 11.48).

53.     Moreover, "[t]he fact that some class members object to the Settlement does not by itself prevent the court from approving the agreement."  (*Id.* at *16)  As this court has previously explained, "[a] court should not withhold approval of a settlement merely because some class members object."  *Henry I*, 238 F.R.D. at 600 (quoting *Michigan Hosp. Ass'n*, No. 5:89-CV-00070, 1991 U.S. Dist. LEXIS 2058, at *10 (W.D. Mich. Feb. 11, 1991)).

54.     Of the 11 Class members who objected, 3 stated no basis for their objection.  (Dkt. #38, Exh. 1, pp. 9-10, 13 (Shelton, Paiva, and Noziol objections)) Because there is no way for the court to determine the basis for these objections, and whether the objections have merit, such objections carry little weight.  See *In re Rio Hair*

*Naturalizer,* MDL No. 1055, 1996 U.S. Dist. LEXIS 20440, at *43 (E.D. Mich. Dec. 20, 1996) ("General objections without factual or legal substantiation carry little weight.") (quoting 2 Newberg on Class Actions 3d, § 11.58); *see also* Henry I, 238 F.R.D. at 600 (same).

55.     A fourth Class member who objected spoke both in favor and against the Settlement Agreement.  (Dkt. #38, Exh. 1, pp. 7-8 (Hayes objection))  The Class member stated that she "will reserve [her] rights to objection by sending this letter."  *Id.* She noted, however, that the retiree contributions described under the Settlement Agreement "are a lot less than I am paying now" and concluded that "[t]he Amended Plan sounds good to me."  *Id.* (emphasis in original).   The other statements made by this Class Member are addressed in paragraphs 54 and 55 along with similar statements by other objectors.

56.     Two Class members objected to the fact that Class members were not allowed to vote on the Settlement Agreement.  (Dkt. #38, Exh. 1, pp. 2, 14 (Whitehouse and Alonzo objections))  As this court has previously explained, the "objection . . . that retirees were not allowed to 'vote' on the settlement . . . does not constitute a proper objection, or address any aspect of the settlement . . . . A vote by class members is not the means provided by Rule 23(e) for ensuring the fairness of a class action settlement. Rather, the class members' interests are protected by Rule 23(a)'s requirements such as commonality and adequacy, and by the fact that class members may not be bound to a compromise without independent judicial review to ensure that the proposed

settlement is fair, reasonable, and adequate." *Henry I,* 2006 U.S. Dist. LEXIS 14890, at *71.

57.     Four objectors asserted, in effect, that retiree health care benefits are vested. (Dkt. #38, Exh. 1, pp. 4-8, 14 (Hayes, Whitehouse, Evans, and Gole objections))  This objection cannot lead the court to disapprove a settlement that is fair, reasonable, and adequate.  "A disagreement over the merits of the parties' dispute¼ is not a basis for disapproving the settlement." *Henry I*, 2006 U.S. Dist. LEXIS 14890, at *69 (citing *Laskey v. UAW,* 638 F.2d 954, 956 (6th Cir. 1981)).  Furthermore, "[r]egardless of whether the court were to agree with . . . [the positions of the] Class with respect to the merits of this lawsuit, the law provides for settlement of even so-called 'meritorious' claims, reflecting the fact that settlements are generally based on several different considerations."  *Id*.

58.     Several objectors asserted unfairness or individual hardship, (Dkt. #38, Exh. 1, pp. 2-3, 7-8, 11, 14 (Hayes, Whitehouse, Brohl, Alonzo, and Roths objections)) or raised issues such as the viability of the VEBA or the allegedly different benefits received by current employees.  (Dkt. #38, Exh. 1, pp. 5-6, 12 (Schmidt and Gole objections)).  As this court has previously explained, such objections "offer no basis for disapproving the settlement." *Henry I*, 2006 U.S. Dist. LEXIS 14890, at *109.  Although there can be no guarantees that the VEBA assets  will be sufficient to provide the modified levels of health benefits for the lifetimes of all covered retirees and eligible dependents, the court has concluded that the status quo presents greater risks to the Class.  With respect to the objections to particular provisions of the Settlement Agreement, "in considering the extent and significance of the objections, 'the Court must

view the agreement in its entirety, rather than isolating individual components of the agreement for analysis.'" *Id.* at *110 (quoting *Robinson,* 2005 U.S. Dist. LEXIS 11673, at *16-17)).

59.     Another objector complained that the settlement "only pertains to the retired employee[s]."  (Dkt. #38, Exh. 1, p. 12)  This objection misunderstands the terms of the Settlement Agreement.  Current UAW-represented employees will, in effect, contribute billions of dollars to the new VEBA through wage and COLA deferrals.  (Dkt. #26-3, Exh. 1, Settlement Agreement, § 9)  Moreover, many current employees are members of the Covered Group and will participate in the new plan upon retirement. Finally, the purpose of the Settlement Agreement is to resolve once and for all the parties' legal dispute regarding Chrysler's role in providing health care benefits to retirees, not to address the terms of benefits that Chrysler provides to active employees during their employment.

60.     In short, none of these objections, either singly or together, provides a basis for disapproving the parties' settlement.  As discussed herein and as shown throughout the submissions of the Class, the UAW and Chrysler, the settlement is fair, reasonable, and adequate.  Accordingly, final approval is warranted.

### III.  CONCLUSION

The court concludes that the parties have achieved a negotiated resolution of a serious and exceedingly complicated problem.  The parties and their counsel have worked diligently, retained highly qualified experts, and given this matter the prolonged and serious attention that it requires.  Based on the expert analysis and disclosures, the court is well aware that there are real risks to the Class associated with the settlement

that it finally approves today.  However, like the parties, the court has evaluated these risks in light of the even greater risks of not settling this dispute.  Accordingly,

IT IS ORDERED that the parties' Settlement Agreement is reasonable, fair and adequate, and the court APPROVES the parties' 2008 Settlement Agreement in all respects and as to all parties.

 s/Robert H. Cleland      
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  July 31, 2008

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, July 31, 2008, by electronic and/or ordinary mail.

s/Lisa G. Wagner      
Case Manager and Deputy Clerk
(313) 234-5522